Where's my... Do I have one of these? On this one case? Oh, just wait. Okay, at any rate. So this is the... I think most of you have argued here before, you know, the signs that we have here. And when the yellow light comes on, we expect you two minutes to complete your argument. And when the red light comes on, that's time to close your argument off for good. And we don't expect you to bring up any new issues in rebuttal that have not previously been addressed either by you or your co-counsel. Or your other counsel. So we call the case of Bruce Owens v. Jastrow and others. And Mr. Isaacson, we'll hear from you for Bruce Owens. May it please the Court. My name is Eric Alan Isaacson. I'm counsel for the plaintiff and appellant in this matter, Mr. Owens. The case focuses on the sad story of Guarantee Financial, which was spun off in December of 2007 and a little over a year and a half later was in bankruptcy. The central question presented by the district court's order is whether the defendants acted with cyander. Specifically, whether we pleaded facts that raise a strong inference of cyander. It requires an inference that's cogent and at least as compelling as opposing inferences of innocent conduct. A tie would go to the plaintiff. I think that the holistic view of the scenario that was present does indeed present a strong inference of knowing or reckless misconduct by the defendants. You've got Temple Inland spinning off Guarantee Financial in December of 2007. A little over a year and a half later it's in bankruptcy. The trustee, liquidation trustee, Mr. Kenneth L. Tepper, filed a lawsuit charging Temple Inland and top officers with fraudulently looting Guarantee Financial and then spinning it off in order to avoid the liabilities that were encountered. That would include Mr. Jastrow and Mr. Dubuque, who were named by Mr. Tepper in the trustee's complaint, as engaging in fraudulent misconduct, looting Guarantee Financial and then spinning it off. So they clearly knew that there was a problem there and they had a motive to conceal what they had done in order to make sure that Guarantee Financial didn't violate regulatory capital requirements, which would cause the Office of Thrift Supervision to come in and take over and also to raise the capital that it needed so desperately. In fact, during the class period, they managed to raise $600 million in private placements. So you've got facts there showing knowledge on the part of Temple Inland, its CEO, Mr. Jastrow, and Mr. Dubuque, who was CEO of Guarantee Financial with Mr. Jastrow as chairman of the board at the beginning of the class period and significantly into it. So Mr. Jastrow is basically his boss and he's answering to him. Now, you've got the company, in addition, overstating its assets by tremendously large amounts, which I think is a significant fact, too. We're not talking about minor overstatements. It could have been a matter of negligent oversight. We're talking about an overstatement of income-retained earnings and regulatory capital of $483 million by June 30 of 2008. And then by July 2009, OTS, the Office of Thrift Supervision, in fact, steps in and directs the company to record a $1.6 billion other than temporary impairment for unrealized losses as of March 31, 2009. Given the fact that the whole picture here, which has to be— And how are you holding—to start with the individuals, how are you holding Mr. Jastrow liable here? Where is the scientist as far as he is concerned? Well, Mr. Jastrow was the CEO of Guarantee Financial when he caused it to— What did he know? Pardon me, of Temple Inland when he caused it to be spun off. What did he know and when did he know it? I think that he knew it when he caused it to be spun off. They were looting the company. From the outset? From the outset he intended to defraud? I believe so, Your Honor. Where is your evidence of it? What's your allegation of it? Evidence will start with the Tepper complaint, which was settled for $80 million. That's not a nuisance settlement. It was a complaint that named Mr. Jastrow specifically for engaging in conduct that fraudulently looted Guarantee Financial. Now, once you've done that, you're not going to immediately come clean on the financial statements. He was chairman of the board of Guarantee Financial after it had been spun off, and he signed a 10-K. Now, he says, I'm not responsible for the 10-K. The Supreme Court in Janus Capital says it's the people who make the statements in the 10-K who are liable. Well, if you signed the 10-K, you made the statement, and he was chairman of the board when he signed it. Janus Capital said that investment advisors who ran mutual funds weren't liable for statements— What are you trying to show? What are you trying to show that he knew, and what did he know, and when did he know it with respect to the evaluation of these securities? I think that he knew— That it was fraudulent, that it was not going down simply because the market was going down, but it was because of some specific fraud that he knew of. I think that he knew from the beginning that Guarantee Financial was undercapitalized. Okay, so? Well, because it had been looted. Okay, so? And from the beginning— Where does that take you? And from the beginning, they had an incentive to overstate the assets. And then you have, as— Okay, so where does that take you? Take into his own personal conduct, his own personal knowledge of the fraud you're charging him with. I think that as the person who is responsible for things, it's a reasonable inference that he knew them. It's certainly a plausible inference— You think that satisfies the requirement of science? Well, it's a plausible inference that discovery will demonstrate those facts, which is— I don't know what— That's the standard of Iqbal and Ashcroft versus Iqbal. I mean, have you had an opportunity to engage in discovery? No. This is a pleadings motion. Would you have engaged in no discovery prior to the pleadings motion or after it was filed? It is not permitted to engage in discovery in a securities fraud class action. The Private Securities Litigation Reform Act of 1995 places a stay on discovery pending motions to dismiss. Part of my problem, the district judge repeatedly asks you to specify. So you have first that immense chart going exactly, count each side indicating whether it shows scienter or not. Then you had this amended version, and then you even were given the chance to write the synopsis. And when I look through that looking for indicia of more than negligence, you know, inexcusable, beyond inexcusable negligence, I think the allegations accept the following, that there were public disclosures, which the Second Circuit has said undercuts an inference of Siender. The investments here were trans-structured and had ratings of triple A until at least, what, 2008? They had ratings of triple A. And Dubuque, if that's his name, was actually purchasing stock during the same period. The OIG report that is in the record suggests that even the OIG and the Board of Directors here didn't foresee that investments rated with triple A would collapse also. So that's an enormous amount and array that it seems like your allegations accept, that under case law doesn't rise to this extreme, not ordinary care standard. Well, Your Honor, paragraph 77 of the Second Amendment has a chart that shows the dramatic rise of delinquencies doubling in less than nine months, or doubling in nine months. That's up to 250 percent? Yeah. Yes. Okay. So it was apparent that the credit rating agencies at this point were behind the curve. Do you have any case that has found Siender at this strict level of fraud pleading where the rating agencies were giving the stock triple A rating? Do you know of a single case out there? A case did not come to my mind. Are you familiar with Judge Cabranes' decision in the Second Circuit, the Pontiac decision in May of this year? I believe I've read that. Okay. And it seems to me that the Second Circuit is highlighting that if the rating agencies are saying this is, and that's, most of your statements that I saw on the chart say, well, while technically correct, in other words, rating it the same way that the ratings agencies were. The rating agencies at this point were losing credibility. I mean, the ratings were not, in my opinion, reliable ratings, and it was becoming apparent during the class period that they were not reliable ratings. We have a confidential witness within the company telling Mr. Dubuque that you can't rely on this stuff. You've got to be modeling it. Well, this stuff, you can't. I think specifically what the CWs are saying is you can't rely on our own internal modeling. But there's no suggestion that they're telling Dubuque that the triple A ratings can't be relied on, is there? Well, I don't think the triple A ratings can take the place of their own internal modeling in a circumstance where you've got to rely on that. In the negotiations, did you describe the CWs as having said these modelings could be improved? Is that their word, or was that your word? I think that they were concerned that the modeling was inadequate, quite frankly. But if they're speaking of improving it, that doesn't sound to me like it was fraudulent at the outset. It may have been deficient. Well, I mean, if it's deficient and you know it's deficient, then you know that your statements don't have an adequate basis, and that even in common law amounts to knowing fraud. Well, maybe let me phrase it again. Forget the Second Circuit. Which of the four or five cases that we've issued do you think you fit in most, solidly, where Sienta was found? I'm not certain, Your Honor. But that's going to be difficult. Each case stands on its own facts. Well, pick any of the ones that you cited, Lombard, Nathanson, Spitzberg. I think I'll go with Nathanson because Nathanson is a case where they know that the patent is the most important aspect of their business. Just as here, 22 percent. It's a bank with 22 percent of its portfolio in these securities. And in Nathanson, the importance of the patent raised a strong inference that there was knowledge of falsity. And there was a motive to misrepresent, just like there's a strong motive here to misrepresent because if they don't misrepresent, the bank is going to be in receivership, as it ended up. If they don't misrepresent, they can't raise capital that they know that they desperately need. They raised $600 million. That's a $600 million motive, Your Honor. No, and the district court said you've got motive. It's just when I look at the case law, most of them are veering towards actual knowledge. Well, that's unfortunately – I understand some of the cases look like they're veering toward actual knowledge, but that's not the proper standard. The proper standard is severe recklessness. And severe recklessness asks whether they knew that there was a risk of misleading investors. The facts known to them should have raised a risk of misleading investors that was known to them or that was so obvious that they must have known of it. And I think that you've got that here. I think that you've got that here when you've got the confidential witness inside the bank going to the ALCO meetings, the Asset Liability Committee meetings, saying our modeling is inadequate. We need to fix our modeling, sending emails. It would be a stronger case if they were saying our modeling is wrong. If they say it's inadequate, that sounds like severe, poor business judgment. But if you know that it's – It doesn't sound like fraud. If it's – you know that it's inadequate, you cannot then report that you've got adequate internal controls, and you cannot put that – statements that you've made forth as having an adequate basis. The truth is that you don't know, and if you don't know – How many misrepresentations that you allege occurred after the crediting agencies downgraded here? How many of your misrepresentations allege to have attributed? That – do you have that answer? Because that's an important question for me. I don't have that answer. I'm sorry. But, I mean, we do know that the ratings were unreliable, and I think that we know that the people inside the bank had indications that there were serious problems with these portfolios, with drastically rising delinquencies that they're not taking account of. They turned a blind eye. It's like Lord Nelson putting his telescope up to his blind eye so that he doesn't see the order that he retreat rather than attack. I mean, it's a willful, deliberate ignorance of what's going on here, and it's something that they needed to account for properly. They disclosed a lot of the issues, a lot of the problems in their SEC filings, and the defendants rely on that to say, oh, well, look, we disclosed all of these issues. But the fact is they didn't take proper account of them in the accounting, and investors are entitled to understand that the accounting takes into account what the defendants clearly knew, what they said they knew, and they didn't do that. It's not for your unsophisticated investor to try to piece stuff together and say, well, you know, a better accountant would have done things differently. Yeah, but the Abrams decision, which they cite, had a specific statement where we have no accounting issues. And so it looks to me pretty much on all four squares with this. And then the court said, you know, if there were accounting problems, that's not enough. Well, accounting problems that you know are a problem are enough. Accounting means much of anything. And what's your best case for that in this context? My best case for investors relying on – No, your best case for having inadequate or imperfect accounting measures being equated to the fraud level that you've got to reach. It would seem to me that Abrams is standing in opposition to that process. We've got cases like Enron where there's accounting fraud. There's plenty of cases with accounting fraud. Well, but those are ones where they're denying publicly that they've got an accounting error. Here, what they seem to repeatedly say is we've got AAA rating, guys. That's what we've got. Well, that's what – they say they've got AAA ratings, but they know that delinquencies are rising. They know that the assets are impaired, and they know they need to take the write-offs. And they know that if they take the write-offs, it will violate the regulatory capital requirements and will put them into receivership with OTS. So they don't do that. How many of these defendants were buying stock in the bank during the period where you allege that they were overstating the value? I guess Dubuque was buying some stock. And how do you harmonize that with an inference of fraud if he's actually – I think that people do – it could be consistent with recklessness. It could also be consistent with wanting to have something to point to, to say, well, see, I didn't know anything was wrong. I was buying stock. It would be like an alibi. I don't want to be naïve about these things. People take the purchase of stock as a signal. There are agencies that report on incited purchases and sales, and he knew that he could send a signal to the market by buying some stock. And I would guess that he did not commit a substantial percentage of his own personal assets by doing so. I see that my time is just about up. Any further questions? No, sir, but you've saved some time for rebuttal. I certainly have, Your Honor. And Mr. Dial, representing Mr. Murph. May it please the Court. Carl Dial on behalf of Appellees Gifford and Murph. While the district court briefed the scienter argument, we also – we briefed that here, as well as some alternative grounds, being material misstatement of fact and loss causation in control person. The two things I'd like to spend my time on are the misstatement of fact and the scienter allegations. And I think, first, looking at the misstatement of fact, what we have here, if you boil down all the allegations of the complaint, it boils down to a statement of opinion with respect to accounting estimates. Was the value of the mortgage-backed securities what was stated in the financials? And were there any reduction in value? Was it temporary or other than temporary impairment? The Supreme Court and this Court have said that accounting estimates can differ sizably and still be reasonable. The best case with respect to misstatement of fact – was this a misstatement of fact – is the FATE case out of the Second Circuit, which involved a goodwill valuation issue. And the FATE case said that for an accounting estimate to be a misstatement of fact, it's got to be one, false, and two, not believed by the defendant making the statement. All the sister circuits that have addressed this have followed FATE except one, and that's the Omnicare case, which is cited in the reply brief. And Omnicare involved a statement involving that we believe that the product complies with the law. But it's clearly a statement of fact if they said this is good asset quality, that we have strong liquidity, right? Those statements then, their argument is, are belied by the fact that at the outset, pre-class period, they looted the bank and therefore had motive, and given their very high oppositions, they had opportunity thereafter to try to recoup the undercapitalization by – go ahead. No, go ahead. First, Mr. Murph and Mr. Gifford were not involved in any pre-class looting. There's no allegation that they were involved in any of that. But with respect to, is something good? I would submit that that's also a statement of opinion with respect to that. Right, but strong liquidity. I mean, then the discrepancy ends up enormous, and so it seems like the case law acknowledges, and the district court didn't dispute, that motive is one part that can contribute to inferring scienter, and opportunity is, and then the discrepancy is, all of those are present. You add to that the Tepper allegations, and you're getting closer to a case that can go forward. Well, Tepper does not – As do those two. Murph and Gifford aren't involved in Tepper at all. Yes, that's correct. In terms of the complaint with respect to that. So I guess I did want to add one thing to, if I could, to the Omnicare case. Those cited in the reply brief, cert has been granted on that case. Mr. Isaacson is involved in that one. It's supposed to be argued next month. But the briefs with respect to that basically say, well, it's either you have no basis to support the opinion given or the opinion is, as fate set forth, what the standard was. The other, if I can just spend one more moment on the alleged misstatement, the other support for a misstatement is these financial statements were presented in accordance with GAAP and the complaint alleged that they were not valued on an individual security basis. And I'd like to point out to the court that that's contradicted by the record in which every 10-K, every 10-Q has a big chart in it that lists all the securities, a lot of information about it, including value on a security-by-security basis. So they're not entitled to an inference that this is false when it's belied by the actual record. Moving on to SIENTA, if I may, the standard here is well established. They either knew the information was materially false or they were severely reckless. And I think severe recklessness, the definition of that in Abrams, when Abrams is very close to this case, highly unreasonable, extreme departure from ordinary care, and then that the danger of misleading buyers was either known or the defendant must have been aware of it. And here, if you look at the whole picture under TELA, if you look at not just what's in the complaint, but also the record of all the public filings that you can take judicial notice of and apply those to Mr. Gifford and Mr. Murph, there is no allegation of a strong inference of SIENTA. With respect to Gifford, the allegations are he signed a 10-K, the 2007 10-K, and he signed the first two 10-Qs during 2008. By the way, all of those listed everything as AAA rated. I believe the first time any single security was not AAA rated is the third quarter 10-Q of 2008, and the financials expressly state, or either that or it was in a call with the investing public, and Mr. Murph described all of them are AAA rated except one, and we've adjusted that with respect to whether it's OTTI. But getting back to Gifford, he's rarely mentioned in the complaint. Only three sentences address him in the reply. There's no motive, no Tepper involvement, no discussion about pricing models, no allegation that he was involved in the financial statement that got restated. He had been gone from the bank for a couple months by then. So there's nothing with respect to Mr. Gifford. Mr. Murph, also not a party to the Tepper lawsuit. There was one sentence in the Tepper lawsuit that said Mr. Murph was aware of a need for capitalization, and Mr. Murph was involved in the Tepper settlement, but his involvement in that was a mutual release with the FDIC. Tepper didn't release him. The bankruptcy estate didn't release him. So Mr. Murph, though it was all done as one agreement, that's not an indicia of scienter with respect to Mr. Murph. Likewise, his awareness of a need for capital is not an indicia of scienter. At best, that's a universal motive for all company executives, and some of the cases, some of the district court cases we cited even say that even if the company's very existence is on the line, that still applies. Did Murph stay the longest? Did Murph get the January 07 email from CW1 saying that our modeling is inaccurate? They alleged it in the complaint. They did allege it. They alleged it in the complaint, sure, and that's what I wanted to go to next. It's basically, the way they've alleged that, it's a difference of opinion. CW1 was an investment guy, not an accountant. He's an investment guy, and he discussed the inadequacies of the pricing models that they were using, and Mr. Murph, in terms of what he went through, he went through the valuation process, used bids from Wall Street analysts in terms of what for the securities, and then applied those within the company. Yeah, there was a disagreement from the investment guy with respect to that, but I think that that disagreement is with respect to the accounting estimate, and the investment guy didn't say, hey, you're violating GAAP, or hey, this is just absolutely wrong. There's nothing about it. As the court mentioned earlier, it's inadequate is what he said, but what Mr. Murph did was he disclosed. He disclosed that these valuations are difficult to estimate. They're uncertain. Here's a summary of how we went about it. He disclosed the inputs that were used. He disclosed the AAA rating, the subordination level of the lower level of tranches, the factors that were considered on whether the decision that this was a temporary impairment, and the red flags, the alleged red flags. I think at page 40 and 41 of our brief, we talk about how those were disclosed, including that $483 million that was mentioned in the opening with respect to that. That was each one of those securities were listed. It said that they were on a negative watch list, and those were disclosed to the investing public. Which center case of the variety of ones that you both cited do you think is most on point? Well, I liked Abrams as well, but I think the one most on point is probably the financial acquisition partners versus Blackwell, which Judge Jolly was involved in. It involved Amresco with respect to . . . Amresco had a deal where the first 10% . . . It only lost money if more than 10% of the losses were . . . The first 10% went to other investors, basically, kind of like the tranches here do. The court there said no misstatement and no see-enter, and that it was actually reasonable for the officers to say that the other investors would suffer those losses. My time is just about up if the court has any other questions. Well, thank you, Mr. Dial. We will now hear from Mr. Harrison, representing Mr. McHugh. Please, the court. Unfortunately, Mr. Dial stole all of my accounting thunder, so I'll talk about something else. I'll start with Tepper. I think the fundamental problem with the way the plaintiffs approached the Tepper case is this. Tepper involved claims of fraudulent transfer. The claim was that the parent company caused one of its subsidiaries at an unfair value to get rid of a bunch of assets. That case was settled. Let's suppose it's true. The question is, what was the company left with after it got rid of these assets, even if it was fraudulently transferred? The company reported its MBS portfolio. That portfolio, if accurately valued, was plenty of capital. So the Tepper allegations didn't put the company in a position where it had inadequate capital, unless you also assume that the valuation of those MBSs were fatally defective. That's what this case is about. This case is an accounting case about whether or not it was reasonable to value that MBS portfolio as it was being done, just like the rest of the financial market was valuing them. That puts, I think, Tepper in its proper place. I'd like to, in the short time I have, mention five reasons why I think Siener does not apply to Dubuque, and then I want to talk for a moment, if I have time, about the new case on loss causation that just came out a couple of weeks ago. First, what you have with Dubuque is you have a discussion. You can call it an argument. You can call it a debate. You could call it a raging debate between the accountants on the one hand who were saying, this is how you value the MBS portfolio. If we intend to hold them for maturity, this is when we recognize a loss. Then you have the confidential witnesses on the other hand saying, wait a minute, wait a minute, I don't think that's right. I think we ought to do it a different way. You've got Dubuque, who is the CEO of the company. He's got to make a judgment. Am I going to trust my accountants or am I going to trust these confidential witnesses on a matter of accounting of which I'm not an expert anyway? Does the record reflect that the CW has ever said that a public statement was false? I'm sorry, Your Honor. Does the record reflect that any of the CWs ever told any of the defendants that statements being made publicly were false? I don't believe so. So the dispute was one about accounting. Yes. Modeling, pricing. Pricing model. Is it really as valuable as we say it is? Are we getting to this value correctly? Because what you have to keep in mind, and this goes to the second point I was going to make, these disclosures that people keep talking about, they were at the very beginning of the class period and all three out. And what they were saying was the deterioration of the housing market may impact our securities. It's hard to value these securities because there's no active market in which to trade. Here is how we're valuing these things. This is what was being told to the public. The CWs were saying, well, I'm not sure we're doing it right, and the accountants were saying, yes, we are. Both the inside accountants and the outside auditors are saying the same thing. Now, this was important then. At some point, the values did begin to fall. We all know what happened in 2008. There's not a 401K that can't tell you what happened in 2008. All of these things began to fall, and as they fell, each 10Q reported, here's the value today. Here's what we believe based upon our internal evaluations it is today, and it is less than what we paid for it. We told the public it is now worth less than what we paid for it. We also told the public of this difference, we're going to write off X percent because those are the MBSs that are being held for sale. Accounting now requires that we take a loss on these, but we're not writing off Y percent of this difference because they are securities that are being held for maturity, and as long as we have a good-faith belief that we can hold them to maturity, we don't recognize the loss currently. So the public was being told that. Dubuque signed off along with his inside and outside auditors saying, yep, that's the way the accounting rules work, and that's what we're going to do. When he realized that the securities were downgraded, they were publicly disclosed. We didn't bury this stuff. Page 41 of our brief talks exclusively about this. We reported the securities as they were downgraded so the public could decide for itself whether or not it wanted to continue to trust the internal valuation of securities that did not have an active trading market. What misrepresentations are attributed to your client that chronologically occurred after the downgrade? I think only the third quarter 10-Q, and I think the misrepresentation there, I think the downgrading occurred before the third quarter 10-Q, and I think the misrepresentation was basically the statement that they're only worth X today when, in fact, they should have been worth X minus something else, which really gets into the loss causation argument, which I'll talk about in just a moment, but I believe that's the only one. So you were going to make five points. Which one do you want? Magnitude is the fourth one. I submit to you, even though courts have said the magnitude of the loss can support an inference, I want to remind you that a small error of judgment about a $5 billion portfolio is a big error, even if it's innocent. I'm a golfer. If I miss the tee ball just a little bit with my drive, it's way off into the right fairway, just because it's a little innocent mistake. So I think you have to be careful with magnitude. We were talking about $5 billion. Any error of judgment is going to result in a huge difference. What they're saying is that under Nathanson and that line of authority, if you look at it holistically, you had strong motive if you accept the Tepper allegation of undercapitalization at the start. Then you had opportunity given the positions of these people, and then you have immense magnitude of improper valuations. Put those together, and that's sufficient. I don't dispute that that's what they're saying, and I recognize the courts have said magnitude is a relevant factor, but I think you have to keep in mind that magnitude is always going to be big when you start with a big number. It's the law of big numbers that comes into play. The fifth point, you've already talked about it, the Duke's conduct in buying the stock during the very trading period. They're playing to speculate. Well, maybe he was trying to create an alibi, but I submit to you under the case law a strong and cogent inference doesn't come from speculating that someone may have created an alibi. Here's a man that came out of pocket with his own money at a point in time when he was telling the investing public, this is what I think we've got here. I think he may have been foolish to buy this stock, but I think a lot of people— How much of his own money? You know, Your Honor, I don't think the record shows that. All it shows is that there was a purchase, but the fact is it was his own money. He did come out of pocket, and I think you have to be a little cynical to believe that he was doing that to create an alibi only. I only have 30— Your Honor, you know, cynicism doesn't stop judges from judging. No, it doesn't. But we're dealing with whether or not a fact creates a strong and cogent inference that's at least as plausible as any other, and I don't submit that most people come out of pocket for the purpose of creating an alibi in this matter. The last thing I want to talk about—I only have 16 seconds left—is I want to remind the Court that the new loss causation case came out. That was a very important part in our briefing. That loss causation case, I think, establishes one thing, and that is you must plead that the loss was caused by— you must eliminate all other factors. They made no attempt. In fact, in their brief, they say they don't have to eliminate all other potential causes. The Fifth Circuit says you do. What is that case? It is the— That's all I know. No, I've got it written down, the name of it, Your Honor. It is the Public Employees of Mississippi, number 13-30580, came out, I can't remember, within the last month. Thank you, Your Honor. Thank you, Mr. Harrison. Ms. Flores? Ms. Flores? The time for Jastrow starts with just two minutes because of the rule that bans group pleading. In this complaint, what they would need to have pleaded specifically as to Jastrow is more than just his knowledge of guarantees starting out in some sort of disadvantaged state. They'd need to have pleadings that Jastrow in particular knew either about the lies in the 10-K and the 8-K about the MBS portfolio health or the gap violations, the misstatements they're talking about. And the complaint doesn't have those as to Jastrow. Well, it says—the complaint says that early on he said, I know the California ARM market's bad. That's right. That's the only allegation particular to him. And that's in paragraph 38A. And that's not the kind of particularized knowledge he would need. The knowledge there isn't about what guarantee is reporting. It's just knowledge about one market in particular. And that certainly doesn't cross the threshold that we see. In a case like Abrams, that's our best case. They do probably get— That's the logic the district court ruled on. It wasn't trying to apply the Supreme Court Janus decision, which you point out in the brief, to absolve him as an outside director. So Abrams and Sienta, the district court's ruling is what you're pressing to us. It's not an extension of Janus? Correct. Those issues stand independently. You would only get to Janus if we— Do you have any circuit authority that applies Janus as expansively as you suggest? No, Your Honor. No circuit has confronted the Janus question either way. And so we tee off of just Janus itself and say that Jastrow is more akin to a publisher because although his signature appears at the bottom of these documents, he's not adopting the statements as his own. It's not as though he's reading a speech someone else wrote. In fact, he's essentially an authenticator. He says these are the statements of guarantee. Guarantee is still the registrant on these statements. But as you say, that's an issue independent of Sienta, which we think is the easier basis to resolve the claim against Jastrow. If the court has no further questions, I'll submit with that. Okay. Thank you, Mr. Flores. Mr. Isaacson, you have some bottle time. Thank you very much, Your Honor. I'm not sure which loss causation opinion he's referring to. There was one issued last week by this court called Public Employees Retirement System of Mississippi v. Amidisis, No. 13-30580, filed on October 2nd, which I don't think stands for the point that was mentioned, and which indicates that you need to look at loss causation holistically, that you don't need to have specific disclosures keyed specifically to fraud or false statements. I will submit a copy of that opinion with a Rule 28J letter, Your Honor. With respect to the reliance on fate versus regions financial, that's a little surprising to me. There's a conflict between fate, the Second Circuit opinion, and the Sixth Circuit opinion in Omnicare. The Supreme Court of the United States granted certiorari. I am counsel for the respondents in Omnicare along with Tom Goldstein. The Solicitor General of the United States filed a brief that, though technically on the side of neither party because it asked for the decision below to be vacated, comes in pretty much on our side on the merits questions that are presented with respect to proper standards of liability. In fact, the Solicitor General's time and argument is going to be coming out of our time rather than out of the defendant's. What's the cert question granted there that implicates this decision? Well, the cert question there is dealing with whether a statement of opinion has to be genuinely disbelieved in order to be misleading under Section 11. Now, there's not a standard in Section 11, but the fact of the matter is that fate is a Section 11 case too rather than a Section 10b case. The Second Circuit has gone on to suggest that fate is relevant in 10b cases. The Supreme Court is going to be hearing argument on that point with respect to Section 11. It's going to be hearing argument on November 3rd. And as I say, the SEC and Solicitor General are coming in and sharing our argument time rather than the defendant's. Is it oversimplifying to reduce this? Is this a fraud case or is this a chaos case? In other words, where is the particular allegation of a statement that is reckless or extreme or intentionally false? And just what's your best one for each defendant? This is a fraud case, Your Honor, where they had reason to know that there was a risk, a serious risk of misleading investors, which satisfies the recklessness. By omitting details or by misleading them? By not taking account of what they knew in order to provide accurate, reliable financial statements. Financial statements are supposed to be objectively reliable. I know that there's room for judgment calls in financial statements, but the judgment calls have to be reasonable. You don't get to just make up anything that you want. And if there's chaos going on so that they know that there's chaos and that they can't rely on the information that they're putting out, it is fraud to say you've got internal controls that are adequate, and it's fraud to put out financial statements that you know don't have a reasonable basis because of the chaos. Again, even at common law, if you know that there's not a reasonable basis for the statement that you make, you know that the statement's false even if you're hoping it might be true. So I think that we've got some of it. All those cases, what's the one about the Colombian oil where they say, well, we've got great inflows of oil, but in fact they hadn't even tested yet? They all seem to relate to statements that are falsifiable. The statements here are falsifiable. And, in fact, the Office of Thrift Supervision was voicing concerns to guarantee about the other than temporary impairment, was voicing concerns in the second quarter of 2008. They ignored OTS. But Office of Thrift Supervision, the report that's in the record, the 2011 report, they pretty darn clearly say the Board of Trustees here, just like us, did not anticipate that AAA-rated things would collapse. Wasn't that their own conclusion? OTS came in and made them restate, Your Honor. I know, but wasn't that OTS's conclusion? I don't know. Board of Directors and Dubuque and Jastrow are two different things. Dubuque and Gifford are being told by their staff that there are serious problems. Now, if the Board, outside directors, was not in touch with all of that stuff, we're not filing claims against the Board of Directors. We're not contending the Board of Directors committed a fraud. We are contending that specific people responsible for looting guaranteed financial and for the operation of a guaranteed financial and for making these public statements knew that they didn't have a reasonable basis and, therefore, were, at the very least, reckless. And I think there is a cogent and strong inference of that. Thank you very much, Your Honors.